STATE OF CONNECTICUT *v.* DAVID STEED
(AC 18503)

Foti, Landau and Dupont, Js.

Argued April 28—officially released August 17, 1999

*Alexander H. Schwartz,* for the appellant (defendant).

*Christopher T. Godialis,* assistant state's attorney, with whom, on the brief, was *Mark S. Solak,* state's attorney, for the appellee (state).

### *Opinion*

FOTI, J. The defendant, David Steed, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a, larceny in the second degree in violation of General Statutes §§ 53a-119 and 53a-123 (a) (1) and larceny in

the third degree in violation of General Statutes §§ 53a-119 and 53a-124 (a) (2).[1] The defendant claims that he was deprived of a fair trial because of the prosecutor's comments during closing argument. He also alleges that the trial court improperly instructed the jury on reasonable doubt. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The victim, John Mayo, a fifty-nine year old man, lived alone in the town of Thompson. On the night of July 1, 1989, Mayo solicited the defendant, a male prostitute, in Massachusetts who then accompanied Mayo back to his home in Thompson. When the men arrived at Mayo's home, they consumed alcoholic drinks and engaged in oral sex. Thereafter, the defendant stuck a knife five inches into the back of Mayo's neck while holding him face down against a pillow, causing Mayo's death.

The defendant then remained in Mayo's home for about one hour, did not summon medical assistance and did not notify the authorities. He did, however, clean himself and wipe items he had touched to remove his fingerprints. He then ransacked the home, took Mayo's wallet, removed the money and then removed a number of personal items from Mayo's house. He removed the knife from Mayo's neck and fled in Mayo's automobile. During his return to Massachusetts, the defendant discarded the murder weapon and some other items he had taken from Mayo's home.

The defendant arrived at the home of his girlfriend, Catherine Smith, at about 11:30 a.m. on July 2, 1989, bearing ice cream for her children. He handed her $20, telling her to "get a babysitter [because they] were going

---

[1] On August 31, 1990, the defendant was sentenced to a total effective sentence of sixty-five years. His appellate rights lapsed but were restored by a habeas court on May 9, 1997. Pursuant to Practice Book § 65-1, this matter was transferred by our Supreme Court to the Appellate Court.

out later." He then left to sell the items that he had stolen from Mayo's home. On July 3, 1989, the defendant's cousin, Kenneth Brown, asked the defendant where he had obtained the car that he was driving. The defendant replied that he had "killed this guy in Connecticut" to get it.

Mayo's body was discovered on the night of July 4, 1989. The defendant was arrested the following day still in possession of Mayo's car and telephone calling card and wearing Mayo's wrist watch. The defendant admitted to police that he had killed Mayo, but stated he did not intend to do it and that he had stabbed Mayo in the neck by "accident" and was sorry. Additional facts will be set forth where relevant to the claims on appeal.

I

The defendant first asserts that comments made by the prosecutor during closing arguments deprived him of a fair trial[2] in violation of his rights to due process guaranteed by the federal and state constitutions.[3] The defendant concedes that this issue was not raised or preserved at trial, but seeks review pursuant to *State*

[2] In *State* v. *Pouncey*, 241 Conn. 802, 811–12, 699 A.2d 901 (1997), our Supreme Court remarked that "even when prosecutorial misconduct is not so egregious as to implicate the defendant's right to a fair trial, an appellate court may invoke its supervisory authority to reverse a criminal conviction when the prosecutor deliberately engages in conduct that he or she knows, or ought to know, is improper. . . . Such a sanction generally is appropriate, however, only when the [prosecutor's] conduct is so offensive to the sound administration of justice that only a new trial can effectively prevent such assaults on the integrity of the tribunal." (Citations omitted; internal quotation marks omitted.) The defendant requests that in the alternative, should we conclude that his due process rights were not violated by the prosecutor's comments, we nonetheless should reverse his conviction based upon our supervisory authority over the administration of justice. This, we decline to do.

[3] The defendant has failed to provide an independent analysis of his alleged state constitutional claim, and, therefore, we will not review it. *State* v. *Morales*, 45 Conn. App. 116, 128 n.10, 694 A.2d 1356 (1997), appeal dismissed, 246 Conn. 249, 714 A.2d 677 (1998).

v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989).[4] We decline to review the defendant's claim because it is not of constitutional magnitude and, therefore, does not meet the second prong of *Golding*.

During the initial closing argument, the prosecutor commented: "Subsequently next day, Sunday, [the defendant] sees his cousin. Where does he see his cousin? Out on Main Street. He wants to go shopping for a pair of shorts with the money he's made. He also wants to go buy a tape with the money he's made. What does he tell his cousin? Tells his cousin the truth. He brags about it. Stabbed him in the neck to get the car. That cousin was sitting right here, ladies and gentlemen, and there was an obvious stop in the testimony when I asked him that question. You all saw this and I said to him at that point—tell the truth. I think some of you would have heard me say that from here. Tell the truth. And then the cousin said what he says—says he stabbed him in the neck. [The defendant's attorney] then questions him and, of course, he turns. *I can't pick my witness. My witnesses are who the police find and who come forward. When I am dealing with inner city people, I don't deal with people with country people's values or our values.* I have to put on who I have. He turns. I'm not surprised that he turned in that fashion and said—No. No. It wasn't said like that. Ask yourself why he—when he saw that newscast—talking about Ken Brown now—when he saw that newscast that night, ask yourself why he ran to his mother. Why his

---

[4] Under *Golding*, a defendant can prevail on an unpreserved claim of constitutional error "only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

mother ran to the brother and why all of them ran within ten or fifteen minutes to the police department? Ask yourself if that wasn't the truth that he heard when he was in that clothing store. No other reason for panicking and rushing in that fashion to the police department. Ask yourself all those questions in deciding what Ken Brown was telling you and if Ken Brown was telling you the truth. I submit to you from the evidence and from what he did later, he certainly was telling you the truth. His most true statement was—I panicked when I saw the news. That was his words. Not my words. You can ask for it back from the reporter. I panicked. Ken Brown talking. Panic as he knew it.

"Why didn't the defendant tell Catherine Smith something? Catherine Smith was somebody—I mean besides the story he told, why didn't he tell her the truth? He only knew her for six months. Not even. Versions of three, four, seven months. Ken Brown was a relative. There is the difference in the stories. Would you tell somebody you only knew for six months that you stabbed someone in the throat in that fashion to steal? No. But you would tell your cousin that. *You live in the city and you live in that fashion. If you are a street person, you would tell a cousin but you certainly wouldn't tell that girl that.*" (Emphasis added.)

The defendant claims that "[u]ninvited by the defendant's argument or evidence, the state crystallized its 'us' versus 'them' theory of the case, pandering to racial and sexual stereotypes that had no business being presented to a jury in Connecticut." Our review of the record demonstrates that the comments complained of were isolated and were not part of a pattern of egregious conduct. "We will not afford *Golding* review to [unpreserved] claims of prosecutorial misconduct where the record does not disclose a pattern of misconduct pervasive throughout the trial or conduct that was so blatantly egregious that it infringed on the defendant's

right to a fair trial. . . . In determining whether a prosecutor's conduct was so egregious as to deny a defendant a fair trial, we note that some leeway must be afforded to the advocates in offering arguments to the jury in final argument. [I]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . [W]e must review the comments complained of in the context of the entire trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Hansen,* 39 Conn. App. 384, 395, 666 A.2d 421, cert. denied, 235 Conn. 928, 667 A.2d 554 (1995).

We conclude that this claim is not reviewable under *Golding* because the argument by the state's attorney was not so egregious as to deprive the defendant of a fair trial and the claim, therefore, is not of constitutional magnitude.[5]

## II

The defendant next claims that the trial court's instruction to the jury on reasonable doubt unconstitutionally diluted the state's burden of proof. We disagree.

The defendant neither filed a written request to charge, nor took exception to the trial court's instruction. He, therefore, seeks *Golding* review. See *State* v. *Golding,* supra, 213 Conn. 239–40. While we find that the record is adequate for review and that the defendant has alleged a violation of a fundamental constitutional right, our review of the entire charge leads us to conclude that the defendant has failed to demonstrate that

[5] We also note that even if we were to afford review of this claim, the result would not change. We cannot conclude that the comments complained of were racially inflammatory per se and, further, do not feel that the prosecutor used them in an attempt to "pander" to racial or sexual stereotypes.

the claimed constitutional violation clearly exists and clearly deprived him of a fair trial.

The instruction complained of is as follows: "The state, and I repeat, must prove guilt beyond a reasonable doubt. It is not, however, required that the government prove guilt beyond all reasonable doubt. The test I stress is reasonable doubt. Now, what is a reasonable doubt? A reasonable doubt is a doubt based on reason and common sense. The kind of doubt that would make a reasonable person hesitate to act. Proof beyond a reasonable doubt must, therefore, be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it in the most important of his own affairs. The jury will remember that a defendant is never to be convicted on mere suspicion or conjecture. The burden is always upon the prosecution to prove guilt beyond a reasonable doubt. This burden never shifts to a defendant. For the law never imposes upon a defendant in a criminal case the burden of calling any witnesses or producing any evidence. So if the jury after careful and impartial consideration of all the evidence in the case has a reasonable doubt that the defendant is guilty of a charge, it must acquit. If the jury views the evidence in the case as reasonably permitting either of two conclusions, one of innocence, the other of guilt, the jury should, of course, adopt the conclusion of innocence."

Our review of the trial court's instruction in its entirety leads us to conclude that the challenged instruction did not dilute the state's burden of proof or otherwise misled the jury in any way. Our Supreme Court has upheld identical or similar instructions on reasonable doubt, concluding that such instructions did not dilute or decrease the state's burden of proof when viewed in the context of the charge taken as a whole. See *State* v. *Ellis*, 232 Conn. 691, 705, 657 A.2d 1099 (1995); *State* v. *Francis*, 228 Conn. 118, 134, 635 A.2d

762 (1993); *State* v. *Gomez,* 225 Conn. 347, 354, 622 A.2d 1014 (1993); *State* v. *Stanley,* 223 Conn. 674, 695, 613 A.2d 788 (1992); *State* v. *Smith,* 210 Conn. 132, 150, 554 A.2d 713 (1989); see also *State* v. *Lindstrom,* 46 Conn. App. 810, 820, 702 A.2d 410, cert. denied, 243 Conn. 847, 704 A.2d 802 (1997); *State* v. *Lamme,* 19 Conn. App. 594, 607, 563 A.2d 1372 (1989), aff'd, 216 Conn. 172, 579 A.2d 484 (1990).

The test to be applied is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result; it must be viewed as to its probable effect upon the jury in guiding them to a correct verdict in the case. *State* v. *Schiappa,* 248 Conn. 132, 171, 728 A.2d 466 (1999). Because we determine that this test was met in this case, we conclude that the instruction was proper. Under the third prong of *Golding,* a defendant may prevail on a claim of instructional error only if, considering the substance of the charge rather than the form of what was said, it is reasonably possible that the jury was misled. Id. We find that it was not.

The judgment is affirmed.

In this opinion the other judges concurred.